This case will be dropped at 3.17 at 0160. Mr. Cizek v. North Wall Inc. doing business at the North Wall. We're all about finding a new defendant's plea. I bring on behalf of the Defendant's Appellant, Mr. Zane D. Smith. I bring on behalf of the Defendant's Appellant, Mr. Tim Parker. Thank you very much, Mr. Smith. You may proceed on behalf of the Appellant. Good morning, members of the panel. May it please the Court, Counsels, public. My name is Zane Smith and we are the Appellant in this case. I represent Patricia Cizek. It took me almost six months to figure out how to pronounce that name, so I'm very proud of that. Very good. Congratulations. Thank you. So this comes before the panel on granting of a motion for summary judgment that was filed by the Defendant and the underlying issue resulting in basically the dismissal of the entire case. Quick review of the facts, members of the panel. Ms. Cizek was at a climbing gym, commonly referred to as a rock wall. It was her first time ever climbing. It was her first time in the facility. When she got there, she was told to sign a waiver, got a pair of shoes, and started climbing. Let me just interject a question, a special question. She signed the waiver. She acknowledged reading and signing and understanding the waiver, correct? She acknowledged a one-page waiver. There's a question of fact here. Apparently, the waiver was one page, but it had a front and a back. She signed the front, acknowledged that she signed the front, did not acknowledge signing the back. She did say she understood it, though, did she not? She did. Absolutely, she did. So the question before the panel is a number of issues. One issue is the waiver, as Your Honor points out. The question before the panel is whether or not the waiver constitutes a get-out-of-jail-free or an ability of the defendant to avoid any liability because of any assumption of risk that she may have had because of her signing of the waiver. If I can start on that issue, the question on the waiver is, in general in Illinois, waivers are to be strictly construed against the person who is using the waiver as a barrier to liability. Because it has to be strictly construed, the panel has to look at the actual wording or terms of the waiver and then determine whether or not my client actually weighed the risk that was involved in rock climbing. And it's going to be your argument that the waiver didn't include the risk of jumping or falling off the wall? The waiver does include a very, very specific risk, but not the risk of an uneven floor. And that's really the issue here. My client was up on the wall climbing the very specific rocks. Again, as a matter of fact, what happens is the wall has different colored rocks with tags on it. And the yellow tags are beginners. So she is told, you are to follow this path along the wall with these yellow rocks and stay on just that path. So the path is determined by the defendant. The flooring is determined by the defendant. And in this case, she was on the rocks. She became tired, turned around, jumped off, landed on an uneven floor and fractured her ankle. Now, didn't she have something to do with the placements of the mats herself, as I recall from the record? It is our position that that's a red herring. There are three floor surfaces. There's a solid floor, which doesn't move, but is a spongy floor. There's a green set of pads, which are movable by the defendants. These are great, big, huge pads that are movable by the defendants. And then there are small black pads that are movable by the climbers. Whether or not she did or did not move the black pad is of no consequence to this Court's review of the issues because she didn't fall on the black pad. She didn't fall near a black pad. Basically, what happened is she started a black pad where she started to do the climb and then ended up falling on the flooring that was placed by the defendants, which was uneven. Well, let me ask you this. You're acknowledging that she voluntarily left the wall, jumped, slid down, whatever. She got off the wall voluntarily. She did. How does your argument square with the well-settled doctrine in Illinois that certain risks, such as putting your hands in fire, going into the deep end of a pool, jumping from a height is considered to be, I believe it's called, open and obvious risk? Absolutely. So whether you're talking about the floor, obviously wouldn't an adult know that jumping from a height could possibly injure your leg or your ankle? Irrespective of the floor you're landing on. And there's no question that as an adult, she appreciated the risk of climbing high and falling or jumping. There's no question about that. The issue, though, is not the risk of appreciation of the falling. The issue is whether or not the area that she was climbing was defective and whether that defectiveness was caused or contributed by the defendant.  No, the floor. The floor was defective because of the placement of the mats by the defendant. Under the defendant's theory of, listen, everybody knows if you fall, you're going to hurt yourself, would then take it to the obvious extreme. If there were broken glass bottles on the floor, the defendant could make the argument, well, everybody knows the risk of falling. Yeah, but those would be obvious, too. I mean, you don't assume that when you're rock climbing there's broken glass. I mean, the floor is the floor. But you would assume the floor would be even. And she fell not because she fell on an even floor. She fell on an uneven floor. There was one mat that was green and one mat that was gray, placed by the defendant, nothing to do with the plaintiff. The plaintiff had nothing to do with the placement of those two mats. And the difference in height is how much? Yes. The difference is how much? Are you talking a foot difference or three inches? No, no, no. We're talking an inch or two. I don't remember exactly what it was, but the difference was enough that when she fell at that speed at that height, it fractured her ankle. And there's no question that because she fell on an edge of it that that caused the injury. Is it significant whether it's a one-foot difference or a two-inch difference? Oh, I don't think it's significant at all because the issue is it should have been flat. There's no question that it should have been even. Either the mat should have been placed there by the defendant in such a way that there was a flat surface or it should have been, she should have been warned about the fact that these flat surfaces were not, that the floor was going to be uneven. What mats did she place? There was some reference in the deposition that she had something to do with placing mats somewhere. Right. So there is an issue that she had a black mat. There's a smaller mat that's light that she can drag over and place where she's going to climb. The problem in the case is that she was giving absolutely no instruction. She was not told, look, when you're going to climb this route with these yellow tags, you need to make sure you've got mats along there. Or you need to watch a video so you know to only jump on one color mat, uneven mat. Did you watch the video subsequently? After the fall? Yes. No. Have you as counsel watched the video? I did not. So do we know whether the video instructed with respect to the mats underneath? The defense says the video instructs people how to climb and how to climb safely. I don't know the answer to that question, Your Honor, of whether or not it directly refers to the mat. You're absolutely right. But you refer in your briefs to the Colarco case. In that Colarco case, unlike this case, in this case the release was pretty specific, was it not? Unlike in Colarco. I mean, you were saying she signed with respect to one page. Was there supposed to be a signature on the other side as well? There's supposed to be an initial. You're supposed to initial the other side. But that release was pretty specific. It was. And the specific risks that are released are not any of the risks that were involved in this case. Page 13 of our brief, she signed off the risk of falling off the climbing gym and hitting rock faces or projections. She, rope abrasion, injuries from other climbers falling on her. Cuts and abrasions from skin contact. Failure of rope slings and harnesses. Was this also not a part of the waiver that she waived any cause of action arising out of or in any way related to the use of the climbing gym, whether supervised or unsupervised, over an injury or damage, however the injury or damage was caused. Use of the climbing gym. That's what she was doing. She was using the climbing gym. That's the catch all, include all waiver that is against public policy. The difference between this and Calarco is there were, didn't hone in in Calarco on the specific activity. Here they did. Well, and I would, I agree that there's a distinction between the cases, as you pointed out. But here they did not. They did not ask my client to waive the risk of anything that was specific that caused her injury. If we accept the defendant's argument that, well, we've got this general language that says no matter what happens, if you hurt yourself climbing, you're covered, I believe, and I would suggest to the panel that that's against public policy. Because if that is the policy in Illinois, any general waiver for any activity gets the defendant out of liability, regardless of the act or fair act on the part of the defendant. So then it would be your position that in a waiver you would have to list every possible way someone can be injured on any equipment? I don't think you have to have a hundred-page waiver. But I do think you have to have at least the issue that's involved in order to rely upon the waiver to get out of liability. But let's assume you're saying you're making the point about the uneven floor. I'm still getting hung up on how that ties into the open and obvious danger. It seems to me, depending on how you land with your ankle and the height you jump for, you could, under your theory, have a perfectly even mat and still get injured. And that's what the waiver covered. You could. Any way climbing the rock wall. You could. You're saying if the floor wasn't perfect, then a release doesn't matter. Well, under that argument, if my client fell and the floor was flat, I think the defendant could argue that that was a risk that was involved in climbing because there's no defect either caused or contributed by us as a defendant. In this case, it is not the falling. It is not the landing on an uneven floor, but the placement of the mats by the defendant that caused or contributed to the uneven floor. And you made this argument to the trial court specifically about the uneven floor. I did. Okay. I did. And the trial court had actually, if you look at the transcript from the argument, the trial court had a difficult time with the issue of the mats because the question is who controlled the mats. And in this case, the defendant had exclusive control over the mats that caused the injury. Couldn't some of the mats be moved, though, easily? No. And that's the hard part to understand about this case. The three levels of flooring, obviously the one level is just solid. You can't move that. This green net is a gigantic net. It's not something that the climbers can move. And the climbers were prohibited from moving it. It was only these small black mats that they could move around. Right. So they could not move the green net. The green net was in exclusive control of the defense. But the black net. The black net was, yes, yes. And there's no evidence at all, there has been no testimony whatsoever, that had my client moved the black mat or put the black mat underneath the floor or done something with the black mat that that would have obviated the risk or would not have caused an injury. Can a person get injured jumping off a wall or landing on a perfectly flat floor? Absolutely. Are the black mats just these personal size mats that are two foot by four foot? I don't remember how big it is. I'm sorry. But they are small enough and light enough that they can be dragged around. But, again, there's no evidence that my client was either instructed how to use the mat, whether she could use the mat, how to place mats, how not to place mats, how the areas that she should jump or not jump off of. What mats did she move? She moved some, right? She didn't move a black mat, an individual black mat. But, again, and I don't want to repeat myself, but the flooring is unmovable because that's just installed, and the green mats were unmovable by patrons. These are gigantic mats that could be dragged around by the defendant. I would also point out that the yellow rock holds, the path that the beginning inexperienced climbers use, are placed by the defendant. So the defendant knows the path that the novice climbers are using and should have known, arguably, that that path underneath the novice climber should have been even, the floor should have been even. So we know that there's a path that the climber would move and that the floor underneath those holds should have been even. That was determined by the defendant. So the path of the climbing rocks is determined by the defendant and the area placement of the green mat is determined by the defendant. Did you ever join the Zimstie as a defendant? No. You mean individually? No. No. No. But that was their last date. First and last. First and last, yes. That was their first and last date. On Valentine's Day. See, we read the record very carefully. I see that. Well, from the record, then, you can make the determination. Our position is that, and I don't know if the panel wants to hear the argument on the Wilfram Watten question, but the issue here is that whether or not there's a Wilfram Watten issue in the case was and should be and is one of the issues that are before the panel. The Wilfram Watten argument in this case is that the defendant had policies and procedures and steps that were in place that they argued were put in to protect the plaintiff. Thank you very much. We'll have an opportunity to address the Court again in a moment. Thank you. Mr. Huffman, good morning. Tim Huffman for the defendant. Justice Spence, to answer your question, the black mats were actually six by six. So, in other words, as tall as me and as wide as me, too. But anyway. And how thick? What's that? How thick? Like an inch thick? Something like that. And, you know, your standard mat, like a couple inches, you know. But anyway, so I'm six feet tall. So, basically, where she said she voluntarily jumped off the wall was about here, or say a little bit above the podium, or maximum, say, at neck level. So that's the one thing to remember here. This was her third time climbing the wall. She had done it successfully, and she voluntarily decided to jump off the wall. Now, let's think about this for a second. So, in page 350 of the record, she testifies that she very carefully took the black mat and she centered it where she started to climb, thinking that she might go back to that precise area and jump back down on the black mat, the six by six mat. Now, say the same thing had happened, and she jumped down from the wall, from about here or here, and she, the one foot landed on the black mat and the other foot landed on the green mat. So, basically, it's the same thing, and it's exactly the peril that the release contemplates. Well, his argument is perhaps more subtle. He's arguing that, yes, she waived any risk of being on the wall, jumping off the wall, but didn't waive the risk of falling on an even mass. It's apples and apples. They're so, I think maybe that's why it's not in the releases, it's so obvious that if the language is such that any injury resulting from falling off the wall, you don't get injured as you're Michael Jordan-esque flying through the air. The injury is when you hit the ground. And as you pointed out, Justice Hudson, she could have landed flat. Actually, the record is clear. She said she landed flat on her feet. One was just a couple inches up and the other was just a couple inches down. She didn't say she twisted her ankle. She didn't say she hit the side of it. She landed like this. However, there would be a limitation, as I'm listening to your argument. We're about to say if somebody fell off a wall and they were defective, the flooring then of the mass was defective and somebody actually went three feet into the floor, you wouldn't be arguing that that was waived, would you? No, not at all, because that's not expected and intended. Here she expected and intended to land. That's why she positioned the 6'6 black man. But all the case law that throws out the release, it's crazy stuff like the Vic Taney case where hydrochloric acid overcame somebody. Vic Taney, wasn't he a 50s guy? Yeah, he was a 60s guy, one of those Jack LaLanne. I think so, yeah, one of those Jack LaLanne type guys. I'm dating myself. But anyway, it was, again, it's expected and intended and part and parcel of where you're going to land. But you're going to land on the floor. Yes, and that's one point I want to make, too. The floor itself was a two and three-quarter inch mat. The gray floor was actually a gray mat. That's clear from Mr. Sipri's testimony. So even if she had just landed just on the gray mat or gray floor, that's actually a mat. So there's no, I don't even think there's any negligence here, much less Wolf, Long, Watt negligence because, again, I'm sorry, Justice. Now you mentioned Mr. Sipri. Let's talk about his testimony. First of all, part of his testimony was that there are policies that the Climbing Wall Association tells you that you need to spend some time with a new customer and explain the policies and procedures of bouldering or rock climbing. Also, Mr. Sipri testified that they had a safety video that was offered that they were supposed to have individuals watch this safety video. They did none of that. When you walked in, there was like a menu, and on the menu were all these items. Right. How did they know she looked at it? How did they ensure that a new customer was going to stop and look at that menu? Did they have them sign something saying, I looked at the menu? No, there wasn't. Did they sign anything saying, you know, other than the release, saying I showed them the video or I was going to show the video, the customer declined it? Interesting thing about the video, it was never requested. But what says that they have to request it? No, no, I'm talking about the plaintiff's attorney never requested that in discovery, and we never turned it over. It's not part of the record. But it is part of the record that the employees were instructed to follow the policies of the Climbing Wall Association, and part of that was explain the policies and procedures showing this video. That's absolutely true. So why aren't they negligent in not doing so? Here's why. Because the accident had nothing to do with any of that. She said that this was her third successful climb, and it was a successful climb, and she just felt she was tired, and she wanted to jump or really step off. So she stepped off, jumped off onto the mat, and she was probably thinking that I wanted to land full on the green mat, and then it was this. And really, honestly, there's no evidence that this one-foot landing on the green mat and one-foot landing on the gray mat, which is what it was, really was anything negligent anyway, because she doesn't say that she stepped on the side of the mat or I hit one and then my weight went to the other. There's no evidence. Well, again, I think maybe we need to keep it in the context, again, of the open and obvious danger. Yes. Along the lines of what Justice Justice is talking about, and I see your point, if you've got a bunch of children in a swimming pool, a municipal swimming pool, and you've got a lifeguard there who is watching them jump around and doesn't do anything, talk to them or have any training that would bear any issue, that might be one thing. But let's assume you have an adult who has a few too many drinks, knows they can't swim, and jumps into the deep end, the 10-foot end of the pool. What's the nexus? What would be the difference if the lifeguard didn't say anything to him because it's an open and obvious danger? There is no. And that's analogous perhaps to jumping off the wall. It's going to be dangerous. There's no, and I can't remember the name of the case. I apologize, but there's the case where these people jumped off like a 10-foot retaining wall in the Lake Michigan, and they were injured because it wasn't deep enough. And the court there said, hey, that's open and obvious. If you're going to jump into a lake from a retaining wall, you bear the risk of how deep it is. If it's open and obvious, why did they even offer a waiver? Why do you need to offer a waiver if it's open and obvious? Because there's just so many ways. For instance, I was thinking about an example. Say you have a martial arts gym or, say, a jujitsu place. You walk into a place like that. There's mats on the floor. There's not mats on the floor on a basketball court or a racquetball court or a badminton court. It's part and parcel of the activity. So the waiver is because of the fact that it's a risky endeavor, and it's a tradeoff. If you want to do this risky endeavor, you trade off being able to sue us in negligence. Let's be candid and blunt. It's also a tool to discourage the lawsuits. It is. I mean, it has a dual purpose. It lets people know, well, wait a minute. You signed this. You can't sue us. Yes, and the trial judge said that very well. He said that courts don't like them, but courts enforce them, and including in a specific instance like this where the exact type of risk is not specified in the waiver. But again, it has to be a part and parcel thing. It has to be a natural thing like the judo place. There's mats on the floor. Why? Because you can fall, and you can hurt yourself. So in the judo example, say somebody tossed somebody, and they landed just about all on the mat, but their foot landed off the mat and on the floor. I mean, you're saying, well, you couldn't get sued for that? You could get sued for that. No, you couldn't because it is part and parcel, and it's expected and intended, and flows naturally from what the language is in the release. And like in the clerical case, they didn't say anything about anything. But here, again, it's all manner of injury resulting from falling off a climbing gym. And again, it's not the falling off. And again, the trial judge said it so well. It's the hitting that matters. In other words, that's where you're going to get hurt when you land like this. And there's all manner of ways that you can get hurt when you decide to do this. And that's the truest thing said here. This might have been the lousiest first date ever in the history of first dates. But again, she knew what she was doing because she had done it successfully, and she turned around and jumped off. When she was bouldering, did she boulder above the line? Do you know? Yes, she did, and that's why I pointed out, Justice Shostak, that just the basically right about here is my tie line. That is where that's four feet. So here's five feet. The bouldering line is three feet, which is about here. You know, if anybody plays golf, it's a three-foot putt. So that's kind of, you know, there's like saying, you cannot really climb above this line, and it's a guideline, really. But she's really not that high above that line at all. She says she's a foot or two feet over, max. Didn't Kaczynski, the length of experience rock climbing would tell her specifically that it's dangerous before she even started? Rock climbing is dangerous? I recall reading that somewhere. Rock climbing is dangerous. Let's go on that date. Yes, Valentine's Day. Yeah, he told her. What a great first date, you know. But, again, whether or not he should have been sued, that's an interesting question as well. Well, my courts professor in law school used to say, invite everyone to the party, so. He did. That goes into the whole Wolfram Watten thing as well. I think clearly with the waiver, this injury was knocked out. From a negligence standpoint, I think it's clear Wolfram Watten, but it's really more a question of the facts. I mean, you're talking about a three-foot distance. The trial judge had absolutely no evidence in front of him, nor did he have a complaint in front of him, where he could at all grasp why having one mat being this high and the other mat being this high when she lands, one foot on one, one foot on the other, how that could be Wolfram Watten's misconduct. There was no expert testimony. There was no testimony that this injury happened all the time because there was uneven mats. It was, if anything, negligence, but the release clearly covers negligence. Now, I think an interesting case is that Lowell's case out of the 1st District where they had this tennis court, and the lady ran into this hallway and there was this rope ladder she gets all trapped up into. Behind the drain. And it was like, there's no way you'd expect that on a tennis court. I tend to play a lot of tennis myself. That, to me, was a little bit more surprising because— I don't follow that case. Well, yeah, I guess you've already decided. Because that's not something you normally expect to encounter during tennis. No. That's an instrumentality that's not a normal part of a tennis court. In there, it passed muster. The strange part about that case is they said, no, that's included in the release, and you can't sue for negligence. Now, interestingly enough, there was enough facts in the records where they said, you can make an issue of fact on the Wolf 1-1, but those facts are absent here. I mean, there's nothing there which shows— While we're on there, they cited this federal case where the person had a heart attack and the facility, the court found, used a defibrillator and didn't. So how do you distinguish that case from this case? Because that's a weird, offshoot fact. Is that what you want us to say, that's a weird, offshoot fact? Well, that was instructions to the employees. Sure. No, in educating the employees, which I guess you could try and tie it into this case. It's much different. But, again, I come back to the employees. As Zipri testified to, nobody gave any instruction here. But that didn't matter because she didn't have any problems with the rock climbing. She didn't climb 40 feet up and then fall down. She climbs a foot above the line. It was just with a jump deposit, isn't it? Basically, she's like, well, I've had enough of this. I think I'm going to jump off. And, again, if she had had the energy, and she said she was tired, to retrace her steps back to the black mat, she could have jumped like she planned, and then one foot could have landed on the green mat, and one foot could have landed on the black mat, and the same thing could have happened. So how thin do you slice the bologna here? I mean, how long do you have to put down, like you said, Justice Shostak, every single example? You just can't do it. And if it's part and parcel, and expected and intended, and apples and apples, which is exactly what this case is, everything flows together, and whether it's fair or not, courts enforce these exculpatory clauses in these particular cases, just like this. Wasn't there some testimony, though, that it wasn't like she jumped down, but it was the way she had swung, so that perhaps there is a question of fact as to whether it was undone, I had enough, and then jump, or if she fell? No, she definitely says that I had enough, I was tired, I looked down, and I jumped. And she said herself that she jumped. Absolutely. And so in other words, the video, if someone had looked at it and been part of the record, and if it said something, it couldn't say anything like that because everything was so expected and intended, and apart from the fact that when she fell, she twisted and broke her ankle, everything went perfect. But again, that's why, and you're right, Justice Hudson, part of it is to completely knock out lawsuits, whether that's fair or not, that's up to the courts and legislature, but part of it is because you're voluntarily doing this jumping endeavor from right here, you know, four feet off the ground, and, you know, ankles are ankles, and unfortunately you can get hurt. But again, there's nothing, no evidence that this trial judge had in the record that he could say we were willful and unlawfully negligent as well. So unless there's anything else, Justices, thank you very much. Thank you, Mr. Smith. Thank you, Mr. Hoffman. Mr. Smith, you may address the Court in rebuttal. Thank you. In terms of the issues that were questions that were presented by the other side, it was interesting the words that were repeated, expected and intended, expected and intended. The expected and intended is part of the question of what my client expected and intended, and what my client expected and intended would have been an even floor, a floor that was in the exclusive control of the defendant, a path of her climbing that was exclusive control of the defendant, and a burden on the defendant that was very small. All they had to do was make sure that under the yellow tag rocks the floor was even. Also, I want to address the issue of this third successful climb. I want to make sure that the panel understands when we say third successful climb, this was her first time ever climbing. She had climbed up a little bit, climbed down, climbed up, climbed down. This was her third time climbing up and down. So this was her first night ever climbing, and she was climbing without the benefit of any instruction, any assessment, any video, any harness, any rope, nothing. Absolutely nothing was offered her. She was not observed. She wasn't as we all know, Mr. Sipri was supposed to make an assessment of her abilities by observing her and seeing her climb. None of this happened. Well, again, not to parse words, but with not using the harness, not having this instruction, how would that have prevented the injury if somebody voluntarily jumps off the wall? She didn't slip off the wall. Because the harness or the rope would have caused her not to hit the floor with any force. Didn't Kosinski testify? I knew I read this somewhere. He observed the plane that was stopped at one point, and so he went over to help her to figure out what she should do next. She was four or five feet off the ground. Her left foot and hand came off the wall. Her body slung quadwise, and that's when she fell and hurt her ankle. No, Sipri said, I never saw her. Kosinski. Oh, I'm sorry. Well, that was her date. Right, right, right. He saw that. So that's why I'm saying, and I think I asked Mr. Hoffman, is there not a question of fact as to how, in fact, she fell? Did she purposely say, I'm tired, I'm jumping, or did, as Kosinski testified, her hand slipped, her foot slipped, she swung quadwise and came down? I think absolutely there's a question, and that's an issue that should be determined by a trier of fact, not determined as a question of law. Now, that being said, would that make a difference with respect to the waiver? It would, because had she been instructed how to get off the wall, had she been warned about jumping versus falling versus turning her body and landing, any kind of help whatsoever in terms of instruction of how to safely climb a wall was not provided to this client, to my client. The granting and the allowing of this generalized waiver to absolve a defendant of any liability as a matter of law is wrong. What the court should have done was allow the plaintiffs to present their case, let there be a question, a determination of whether or not it would have made a difference had she moved the black man over or not moved the black door over. It would have made a difference had she gotten instruction. It would have made a difference whether or not she watched the video. All of these are reasonable and necessary questions of fact. One last point. There was no bouldering line. This imaginary three-foot line was not there at the time that my client was climbing. The bouldering line was an issue that came out later. And by the way, so what? If there was a bouldering line and she wasn't instructed of what the significance of the bouldering line was, which is don't climb above it or don't climb any higher or don't let your feet go any higher than that, maybe. But the bouldering line didn't exist and she wasn't instructed about whether or not and how to use the bouldering line. So if anyone needed instruction, it was my client, I would ask that the lower court's decision be reversed and my case be allowed to be tried. Thank you. Thank you. Thank you. All right. On behalf of our panel, I'd like to thank both counsel for the quality of their arguments here this morning. The matter will, of course, be taken under advisement and a written decision will enter into force.